# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) <br> JATINKUMAR PARIKH, Individually And ) <br> On Behalf of All Others Similarly Situated, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ) <br> EDUCATION MANAGEMENT CORP., TODD ) <br> S. NELSON, EDWARD H. WEST, JOHN R. ) <br> MCKERNAN, JR., PAUL J. SALEM, ADRIAN ) <br> M. JONES, JEFFREY T. LEEDS, PETER O. ) <br> WILDE, LEO F. MULLIN, GOLDMAN, ) <br> SACHS & CO., J.P. MORGAN SECURITIES ) <br> INC., MERRILL LYNCH, PIERCE, FENNER & ) <br> SMITH INC, BARCLAYS CAPITAL INC., ) <br> CREDIT SUISSE SECURITIES LLC, and ) <br> MORGAN STANLEY & CO. INC. ) <br> ) <br> Defendants. ) <br> _____ ) | **CIVIL ACTION NO. _____** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Jatinkumar Parikh, individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations as to himself, which are alleged upon personal knowledge.  The allegations are based upon counsel's investigation, documents filed with the Unites States Government and Securities Exchange Commission ("SEC"), and reports published in the press.

## <u>NATURE OF THE ACTION</u>

This is a federal class action on behalf of purchasers of the common stock of Education Management Corp. ("Education Management " or the "Company") between October 2, 2009 and August 16, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities

Exchange Act of 1934 (the "Exchange Act"), and including but not limited to those who purchased shares in connection with the Company's October 2, 2009 Initial Public Offering, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"). As alleged herein, in addition to issuing a materially false and misleading registration statement and proxy-prospectus in connection with the October 2, 2009 Initial Public Offering, during the Class Period defendants also published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## <u>OVERVIEW</u>

1.      At all relevant times, Education Management operated as a "for-profit" secondary education provider, offering campus-based and online instructions to enable students to earn undergraduate and graduate degrees, including doctoral degrees and certain specialized non-degree diplomas in various disciplines.   The Company offers education through the Art Institutes, Argosy University, the Brown Mackie Colleges, and South University. The Art Institutes offer associate's, bachelor's, and master's degree programs, as well as selective non-degree diploma programs in creative professions, such as graphic design, interior design, Web design, and interactive.  At the time of the October 2009 IPO, Education Management operated 93 schools in 28 states of the U.S. and Canada.

2.      At the time of the Initial Public Offering of Education Management stock and thereafter throughout the Class Period, defendants issued a series of materially false and misleading statements — including in the Registration Statement and Proxy Prospectus issued in connection therewith  —  regarding  the  growth  and foreseeable profitability of Education

Management.   In fact, at the time of the Company's IPO and thereafter throughout the Class

Period, defendants represented to shareholders, in part, that:

> Our business model has a number of favorable financial characteristics, including consistent historical enrollment growth, high visibility into operational performance, opportunity for future profit margin expansion and strong operating cash flow generation, although the interest expense relating to the significant indebtedness that we incurred in connection with the Transaction has caused our net income to decline in recent periods as compared to periods prior to the Transaction.

> • **History of consistent enrollment growth.** During the period from October 1998 through October 2008, we experienced a compounded annual enrollment growth rate of 18.0%. During the same time period, the schools that we have owned or operated for one year or more experienced a compounded annual enrollment growth rate of 12.0%....

> • **High visibility into operational performance.**   We believe that we benefit from a business model with good insight into future revenue and earnings, given the length of our academic programs...

> • **Opportunity for future profit margin expansion.**   Our business model benefits from scale and permits us to leverage fixed costs across our delivery platforms...

> • **Strong operating cash flow generation.**   We historically have generated strong cash flows....

3. The positive statements regarding the Company's operational performance and future

growth projections made by defendants and contained in the Company's press releases and SEC

filings, made throughout the Class Period, however, were each materially false and misleading

when made, and were known by defendants to be false or were recklessly disregarded as such

thereby, for the following reasons, among others:

> * At all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in Education Management's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained.

\* At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects.

\* During that time, it was also not true that Education Management contained adequate systems of internal operational or financial controls, such that Education Management's reported operational statements and foreseeable growth prospects were true, accurate or reliable.

\* As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Education Management was operating according to plan, or that Education Management could achieve guidance sponsored and/or endorsed by defendants.

4. It was only in August 2010, however, that investors finally began to learn the truth about Education Management after the United States General Accounting Office ("GAO") issued a report that concluded that for-profit educational institutions like Education Management had engaged in an illegal and fraudulent course of action designed to recruit students and over charge the federal government for the cost of such education.   Following these disclosures, shares of the Company collapsed -- falling almost 18% in several trading days as this news reached the market.

5. The damages and losses suffered by plaintiff and other class members were a direct result of defendants' fraudulent scheme to artificially inflate the price of Education Management's stock, and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and fraudulent conduct was revealed. The dramatic decline in the price of Company shares immediately following such time as investors learned the truth about the Education Management is evidenced below:



## JURISDICTION AND VENUE

6.      Jurisdiction is conferred by Section 22 of the Securities Act of 1933 (the

"Securities Act"), 15 U.S.C. §77v; Section 27 of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §78aa; and 28 U.S.C. §1331. The claims asserted herein arise under

Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k and 77o] and rules

promulgated thereunder by the Securities and Exchange Commission (the "SEC"); and Sections

10(b) and 20(a) of the Exchange Act [15 U.S.C.  §§78j(b) and 78t(a)]  and Rule  10b-5

promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

7.      Venue is proper in this District pursuant to Section 22 of the Securities Act;

Section 27 of the Exchange Act [15 U.S.C. §78aa]; and 28 U.S.C. §§1391(b) and 1337.

Defendant Education Management maintains a place of business within this District, and/or the

individual defendants conduct business in and many of the acts giving rise to the violations

complained of herein took place in this District.

8.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff JATINKUMAR PARIKH, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Education Management  at artificially inflated prices during the Class Period and has been damaged thereby.

10.     Defendant EDUCATION MANAGEMENT CORP. is a Pennsylvania corporation with a place of business located at 10 Brookline Place West, Brookline, Massachusetts, known as The New England Institute of Art.  According to the Company's profile, Education Management purports to operate  as  a for-profit  secondary education provider,  offering  campus-based  and  online instruction that enables students to earn undergraduate and graduate degrees, including doctoral degrees and certain specialized non-degree diplomas in various disciplines. The Company offers education through the Art Institutes, Argosy University, the Brown Mackie Colleges and South University. The Art Institutes offer associate's, bachelor's, and master's degree programs, as well as selective non-degree diploma programs in creative professions, such as graphic design, interior design, Web design, and interactive. At the time of the October 2009 IPO and thereafter throughout the Class Period, Education Management purported to operate 93 schools in 28 states of the U.S. and Canada.

**Individual Defendants**

11.     Defendant TODD S. NELSON ("Nelson") was, during the relevant period, Chief Executive Officer and a member of the Board of Directors of the Company.  During the Class Period, defendant Nelson certified the Company's SEC filings, including but not limited to Education Management's Form(s)  10-Q and signed the materially false and misleading Registration Statement and Proxy/Prospectus issued in connection with the October 2009 IPO.

12.     Defendant EDWARD H. WEST ("West") was, during the relevant period, President and Chief Financial Officer of the Company. During the Class Period, defendant West signed and certified the Company's  SEC filings, including but not limited to Education Management 's Form(s)  10-Q and assisted in the preparation of the materially false and misleading Registration Statement and joint Proxy/Prospectus issued in connection with the October 2009 IPO.

13.     Defendant JOHN R. MCKERNAN, JR. ("McKernan") was, during the relevant period, Chairman of the Board of Directors of the Company. During the Class Period, defendant McKernan assisted in the preparation of the Company's SEC filings, including but not limited to Education Management's Form(s) 10-Q and defendant McKernan signed the materially false and misleading Registration Statement and joint Proxy/Prospectus issued in connection with the October 2009 IPO.

14.     Defendant PAUL J. SALEM ("Salem") was, during the relevant period, a member of the Board of Directors of the Company.  In connection with the October 2009 IPO, defendant Salem signed the materially false and misleading Registration Statement and joint Proxy/Prospectus.

15.     Defendant ADRIAN M. JONES ("Jones") was, during the relevant period, a member of the Board of Directors of the Company.  In connection with the October 2009 IPO, defendant Jones signed the materially false and misleading Registration Statement and joint Proxy/Prospectus.

16.     Defendant JEFFREY T. LEEDS ("Leeds") was, during the relevant period, a member of the Board of Directors of the Company.  In connection with the October 2009 IPO, defendant Leeds signed the materially false and misleading Registration Statement and joint Proxy/Prospectus.

17.     Defendant PETER O. WILDE ("Wilde") was, during the relevant period, a member of the Board of Directors of the Company.  In connection with the October 2009 IPO, defendant Wilde signed the materially false and misleading Registration Statement and joint Proxy/Prospectus.

18.     Defendant LEO F. MULLIN ("Mullin") was, during the relevant period, a member of the Board of Directors of the Company.  In connection with the October 2009 IPO, defendant Mullin signed the materially false and misleading Registration Statement and joint Proxy/Prospectus.

19.     The defendants referenced above in ¶¶11-18 are referred to herein as the "Individual Defendants."

**Underwriter Defendants**

20.     In connection with the October 2009 Initial Public Offering, the following investment banks acted as "Lead Underwriters" of the Offering -- facilitating the distributing of 20 million shares of Education Management stock to investors and initiating the first public market for Education Management shares. Not including another three million shares distributed

upon exercise of the underwriters' over-subscription allotment option, the distribution of IPO

shares awarded Underwriters occurred, as follows:

| Lead Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co.[1] | 5,771,960 |
| J.P. Morgan Securities Inc. | 3,666,680 |
| Merrill Lynch, Pierce, Fenner & Smith Inc | 2,087,720 |
| Barclays Capital Inc. | 2,087,720 |
| Credit Suisse Securities LLC | 2,087,720 |
| Morgan Stanley & Co. Incorporated | 2,087,720 |

21.     In connection with the October 2009 Offering, including the exercise of the

oversubscription option of 3 million shares, the Underwriter Defendants were paid at least

$24.84 million in fees, indirectly paid by purchasers of the Company's shares. The Underwriter

Defendants were paid at least $1.08 per share in connection with the sale of the 23 million

shares, including shares sold pursuant to the exercise of the Underwriter's  over-subscription

option.

22.     Shareholders were willing to, and did, pay these fees - equal to at least 6% of the

gross sales price — to compensate the Underwriter Defendants for conducting a purported

significant due diligence investigation into Education Management.  The Underwriter

Defendants' due diligence investigation is a critical component of the initial public offering, and

it was supposed to provide investors with important safeguards and protections.

23.     The due diligence investigation that was required by the Underwriter Defendants

included a detailed investigation into Education Management's accounting and assumptions that

extended well beyond a mere casual review of Education Management's accounting, financial

reports, and operational and financial controls.   The failure of the Underwriter Defendants to

conduct an adequate due diligence investigation was a substantial contributing factor leading to

---

[1] At the time of the IPO, Goldman Sachs owned approximately 54.27 million shares of the Company and JP Morgan owned over 2.60 million Education Management shares.

the harm complained of herein.

24.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they all had access to the adverse undisclosed information about Education Management's business, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

25.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the Nasdaq National Market Exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     The  Individual Defendants  participated in the drafting,  preparation,  and/or approval of the various public, shareholder, and investor reports and other communications

complained of herein and were aware of, or recklessly disregarded, the mis statements contained therein and omissions there from, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Education Management, each of the Individual Defendants had access to the adverse undisclosed information about Education Management's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Education Management and its business issued or adopted by the Company materially false and misleading.

27.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

28.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Education Management common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Education Management's business, operations, management, and the intrinsic value of Education Management common stock; (b) enabled defendants to artificially inflate the price of Education Management shares; (c) enabled defendants to sell at least $414 million of Education Management shares while in

possession of material, adverse, non-public information about the Company; and (d) caused

plaintiff and other members of the Class to purchase Education Management common stock at

artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired the common stock of Education Management between October 2, 2009, and

August 16, 2010, inclusive (the "Class") and who were damaged thereby; including those who

purchased shares in connection with the Company's Initial Public Offering.  Excluded from the

Class are defendants, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns, and any

entity in which defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is

impracticable.   Throughout the Class Period, Education Management   common shares were

actively traded on the Nasdaq.    Following the sale to the public of the 23 million shares,

including shares sold in connection with the underwriters over subscription option, the Company

had over 142 million shares of common stock issued and outstanding.[2] While the exact number

---

[2] On June 1, 2006, the Company was acquired by a consortium of private equity investment funds led by Providence Equity Partners, Goldman Sachs Capital Partners and Leeds Equity Partners (collectively, the "Sponsors"). Pursuant to the terms of the merger agreement, all outstanding shares of the Company's common stock were cancelled in exchange for $43.00 per share in cash. The Sponsors, together with certain other investors, became the owners of the Company. On September 30, 2009, the Board of Directors of the Company declared a 4.4737 for one split of our common stock, which was paid in the form of a stock dividend on September 30, 2009. The following table summarizes as of June 30, 2009 the number of shares of Company stock purchased, the total consideration paid, and the average price per share paid by existing shareholders and to be paid by new investors purchasing shares of the Company in the IPO, (before deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by the Company and excluding the over-subscription shares) - and accounting for the significant shareholder price dilution as a result of the prior ownership shares:

of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Education Management or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the

| | Shares Purchased | | Total Consideration (in 000's) | | Average Price Per Share | |
|---|---|---|---|---|---|---|
| | Number | Percentage | Amount | Percentage | | |
| Existing shareholders | 119,770,277 | 85.7% | $ 1,339,514 | 78.8% | $ | 11.18 |
| New investors | 20,000,000 | 14.3% | $ 360,000 | 21.2% | $ | 18.00 |
| Total | 139,770,277 | 100.0% | $ 1,699,514 | 100.0% | $ | 12.16 |

Class Period misrepresented material facts about the business, operations and management of Education Management; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

34.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a Class action.

## SUBSTANTIVE ALLEGATIONS

### Materially False And Misleading Statements Contained In The IPO Proxy-Prospectus And Registration Statement

35.     In connection with the October 2, 2009 Initial Public Offering of 23 million shares, defendants filed with the SEC a Registration Statement and joint Proxy-Prospectus. These shares were sold to the public at $18.00 per share and opened trading on October 2, 2009 at $20.50 per share, before trading to a first day high of $22.90, before closing the first day of trading at $21.77 per share.

36.     In connection with Education Management's Initial Public Offering, on October 2, 2009, defendants also filed with the SEC, pursuant to Form 424B4, a copy of the joint Proxy-Prospectus.   In addition to describing the terms and conditions of the Offering itself, the IPO Proxy-Prospectus contained statements that attested to the operational strength and well being of the Company.   As evidence of this, the IPO Prospectus described the purported "favorable

financial characteristics" of the Company's business model, in part, as follows:

> Our business model has a number of favorable financial characteristics, including consistent historical enrollment growth, high visibility into operational performance, opportunity for future profit margin expansion and strong operating cash flow generation, although the interest expense relating to the significant indebtedness that we incurred in connection with the Transaction has caused our net income to decline in recent periods as compared to periods prior to the Transaction.

> • **History of consistent enrollment growth.** During the period from October 1998 through October 2008, we experienced a compounded annual enrollment growth rate of 18.0%. During the same time period, the schools that we have owned or operated for one year or more experienced a compounded annual enrollment growth rate of 12.0%. We generally achieve growth through a number of independent sources, including continued investment in existing schools, the addition of schools (organically or through acquisition) and new delivery channels, such as online. The significant investments we have made since the Transaction in numerous areas of our workforce, including marketing and admissions, new campuses and online education and infrastructure, are designed to support future enrollment.

> • **High visibility into operational performance.**    We believe that we benefit from a business model with good insight into future revenue and earnings, given the length of our academic programs...

> • **Opportunity for future profit margin expansion.**   Our business model benefits from scale and permits us to leverage fixed costs across our delivery platforms...

> • **Strong operating cash flow generation.**   We historically have generated strong cash flows....

> All of these characteristics complement the successful outcomes that we deliver to our students, as reflected in our student persistence and graduate employment rates and in student satisfaction survey data. Approximately 87% of undergraduate students who graduated from our institutions during the calendar year ended December 31, 2008 and were available for employment obtained a position in their field of study or a related field within six months of graduation.

37.     In addition to the foregoing, the IPO Prospectus also highlighted the Company's

purported "Competitive Strengths," in part, as follows:

> Our Competitive Strengths

We believe that the following strengths differentiate our business:

- **Commitment to offering quality academic programs and student and graduate success**

We are committed to offering quality academic programs, and we continuously strive to improve the learning experience for our students. We are dedicated to recruiting and retaining quality faculty and instructors with relevant industry experience and appropriate academic credentials....

- **Strong management team with a focus on long-term performance**

Since the Transaction, we have enhanced the depth and experience of our senior management team, recruiting a number of executives with specialized knowledge in key functional areas, such as technology, marketing and finance. The current executive team has been instrumental in directing investments to accelerate enrollment growth and build infrastructure to establish a platform for sustainable long-term growth. Furthermore, our school presidents and senior operating executives have substantial experience in the sector and have contributed to our history of success. We plan to continue to build our strong management team as we execute on our long-term growth strategy.

38.     Regarding the Company's purported abilities regarding "Student Recruitment and Marketing, the Proxy-Prospectus also represented, in part, the following:

**Student Recruitment and Marketing**

Our diverse and metrics-based marketing activities are designed to position us as a leading provider of high quality educational programs, build strong brand recognition for our education systems and disciplines, differentiate us from other educational providers and stimulate enrollment inquiries. We target a large and diverse market, including traditional college students, working adults seeking a high quality education in a traditional college setting and working adults focused on the practicality and convenience of online education and career advancement goals. In marketing our programs to prospective students, we emphasize the value of the educational experience and the academic rigor of the programs, rather than the cost or speed to graduation.

Our marketing personnel employ an integrated marketing approach that utilizes a variety of lead sources to identify prospective students...

Upon a prospective student's initial indication of interest in enrolling at one of our schools, an admissions representative initiates communication with the student.

The admissions representative serves as the primary contact for the prospective student and helps the student assess the compatibility of his or her goals with our educational offerings. Our student services personnel work with applicants to gain acceptance, arrange financial aid and prepare the student for matriculation. Each admissions representative undergoes a standardized training program, which includes a full competency assessment at the program's conclusion. Since the Transaction, we have significantly increased our number of admissions representatives. As of June 30, 2009, we employed approximately 2,600 admissions representatives throughout our schools, representing a 180% increase since June 30, 2006.

39. As investors ultimately learned following the end of the Class Period, the statements contained in Education Management's Proxy-Prospectus issued in connection with the Company's October 2009 Initial Public Offering, referenced above, were each materially false and misleading, for the following reasons, among others:

(i) At the time of the IPO, and at all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management because, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in Education Management's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained;

(ii) At the time of the IPO, and at all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects;

(iii) At the time of the IPO, and at all times during the Class Period, it was also not true that Education Management contained adequate systems of internal operational or financial controls, such that Education Management's reported operational statements and

foreseeable growth prospects were true, accurate or reliable; and

(iv) As a result of the aforementioned adverse conditions which defendants failed to disclose, at the time of the IPO, and at all times during the Class Period, defendants lacked any reasonable basis to claim that Education Management was operating according to plan, or that Education Management could achieve guidance sponsored and/or endorsed by defendants.

**Defendants' Materially False and Misleading
Statements Made During the Class Period**

40.     In total, having sold at least $414 million of Company stock to the public pursuant to a materially false and misleading registration statement and joint proxy-prospectus issued in connection with the October 2009 Initial Public Offering, defendants next embarked on a scheme and illegal course of conduct whereby they attempted to artificially inflate and maintain the price of Education Management shares by issuing a series of materially false and misleading statements that defendants knew or recklessly disregarded were materially false and misleading at that time.

41.     **1Q:10 Results Announced: Record Enrollment, Revenues.**  On November 4, 2009, Education Management published a release announcing results for the first quarter ended September 30, 2009 -- the quarter before the IPO closed.   This release stated, in part, the following:

Education Management Corporation Reports Fiscal 2010 First Quarter Results

PITTSBURGH, Nov. 4 /PRNewswire-FirstCall/ -- Education Management Corporation (Nasdaq: EDMC), one of the largest providers of post-secondary education in North America, today reported its financial results for the three months ended September 30, 2009. For the first quarter of fiscal 2010, net income was $15.8 million, or $0.13 per diluted share, an increase of $19.1 million from the quarter ended September 30, 2008. Net revenues rose 23.1% to $534.4 million from the first quarter of fiscal 2009.

Financial Highlights

Net revenues for the three months ended September 30, 2009 increased 23.1% to $534.4 million, compared to $434.2 million for the same period a year ago. This increase was primarily driven by a 23.1% increase in July student enrollment.

For the first quarter of fiscal 2010, net income for the quarter grew to $15.8 million, or $0.13 per fully diluted share, compared to a net loss of $(3.3) million, or $(0.03) per fully diluted share, for the same period a year ago. Earnings before interest, taxes, depreciation and amortization (EBITDA) increased 52.6% from $59.4 million in the first quarter of fiscal 2009 to $90.6 million in the first quarter of fiscal 2010 primarily due to higher student enrollment.

42.     The November 4, 2009 release also quoted defendant Nelson, in part, as follows:

"We are reporting record student, revenue and EBITDA results for our first fiscal quarter. We are pleased with the successful completion in October 2009 of our initial public offering where we raised proceeds, net of underwriting fees, of $389.2 million and bond tender offer where we paid off $316.0 million of our 10-1/4% Senior Subordinated Notes due 2016. We believe that the completion of these transactions will increase our financial flexibility and provide a strong foundation to support our long term growth plans."

43.     Regarding the Company's student enrollment, the November 4, 2009 release also stated, in part, the following:

Student Enrollment

At the start of the current October quarter (second quarter of fiscal 2010), total enrollment at our schools was over 136,000 students, a 22.7% increase from the same time last year. Same-school enrollment (schools with enrollment for one year or more) increased 22.1% to over 135,300 students. Students enrolled in fully online programs increased 60.0% to approximately 31,200 students.

|  | 2009 October | 2008 October | Percentage Change |
|---|---|---|---|
| Total enrollment | 136,000 | 110,800 | 22.7% |
| Same-school enrollment(1) | 135,300 | 110,800 | 22.1% |
| Students enrolled in fully online programs | 31,200 | 19,500 | 60.0% |

(1)     Schools with enrollment for one year or more.

Our quarterly revenues and income fluctuate primarily as a result of the pattern of student enrollments. The seasonality of our business has decreased over the last several years due primarily to an increased percentage of students enrolling in online programs, which generally experience less seasonal fluctuation than campus-based programs. The first quarter is typically the lowest revenue recognition quarter due to student vacations.

44. **1Q:10 Form 10-Q.** In an effort to continue to inflate and sustain the artificial inflation in the price of Education Management shares, on or about November 11, 2009, defendants also filed with the SEC the Company's 1Q:10 Form 10-Q for the quarter ended September 30, 2009, signed by defendant West and certified by defendants West and Nelson. To condition investors to believe that the Company maintained adequate systems of internal control so as to assure that its disclosures were true, accurate and complete, the 1Q:10 Form 10-Q also contained statements concerning Education Management's controls and procedures, in part, as follows:

**ITEM 4. CONTROLS AND PROCEDURES**

The Company, under the supervision and participation of its management, which include the Company's chief executive officer and chief financial officer, evaluated the effectiveness of its "disclosure controls and procedures," as defined in Rule 13a-15(e) under the Securities Act of 1934, as amended (the "Exchange Act"). This evaluation was conducted as of the end of the period covered by this Form 10-Q. Based on that evaluation, our chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures are effective. Effective controls ensure that information required to be disclosed by the Company in reports that it files under the Exchange Act is recorded, processed and summarized within the time periods specified in Securities and Exchange Commission's rules and forms. These controls and procedures are designed to ensure that information required to be disclosed by the Company in such reports are accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

45. **Certifications.** The Company's 1Q:10 Form 10-Q also contained Certifications by

defendants West and Nelson that continued to attest to the purported accuracy and completeness

of the Company's financial and operational reports, as follows:

1.      I have reviewed this quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2009 of Education Management Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize,

and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2009 By:      /s/ Todd S. Nelson Todd S. Nelson Chief Executive Officer

*    *    *

Date: November 10, 2009
By:      /s/ Edward H. West
Edward H. West
President and Chief Financial Officer

## CERTIFICATIONS BY THE CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of Education Management Corporation (the "Company") for the fiscal quarter ended September 30, 2009 on the date hereof (the "Report"), I, Todd S. Nelson, President and Chief Executive Officer of the Company, hereby certify in such capacity, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods reflected therein.

Date: November 10, 2009

By:      /s/ Todd S. Nelson
Todd S. Nelson
Chief Executive Officer

## CERTIFICATIONS BY THE CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of Education Management Corporation (the "Company") for the fiscal quarter ended September 30, 2009 on the date hereof (the "Report"), I, Edward H. West., Executive Vice President and Chief

Financial Officer of the Company, hereby certify in such capacity, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods reflected therein.

Date: November 10, 2009

By:     /s/ Edward H. West
Edward H. West

President and Chief Financial Officer

46. The statements contained in Education Management's November 4, 2009 release and those statements contained in the Company's 1Q:10 Form 10-Q, referenced above, were each materially false and misleading when made, and were known by defendants to be false at that time, or were recklessly disregarded as such thereby, for the following reasons, among others:

(a) At the time of the IPO, and at all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by fraudulently inducing students to enroll in Education Management's scholastic and educational programs and engaged in other manipulative recruiting tactics which defendants knew, or recklessly disregarded, could not be maintained;

(b)     At the time of the IPO, and at all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's growth prospects by failing to properly disclose that defendants had engaged in illicit and improper recruiting activities, which also had the effect of artificially inflating the Company's reported results and future growth prospects;

(c)      At the time of the IPO, and at all times during the Class Period, it was also not true that Education Management contained adequate systems of internal operational or financial controls, such that Education Management's reported operational statements and foreseeable growth prospects were true, accurate or reliable; and

(d)      As a result of the aforementioned adverse conditions which defendants failed to disclose, at the time of the IPO, and at all times during the Class Period, defendants lacked any reasonable basis to claim that Education Management was operating according to plan, or that Education Management could achieve guidance sponsored and/or endorsed by defendants.

47. **2Q:10 Results Announced.** On February 10, 2010, Education Management published a release announcing results for the second fiscal quarter of 2010, the period ended December 31, 2010. This release stated, in part, the following:

> Education Management Corporation Reports Fiscal 2010 Second Quarter Results Reflecting Initial Public Offering and Debt Repurchase in October
>
> PITTSBURGH, Feb 10, 2010 /PRNewswire via COMTEX/ - Education Management Corporation (Nasdaq: EDMC), one of the largest providers of post-secondary education in North America, today reported its financial results for the three months ended December 31, 2009. Net revenues were $655.5 million, an increase of 25.5% as compared to the second quarter of the prior fiscal year. Net income was $20.3 million, or $0.14 per diluted share. Excluding expenses incurred during the second quarter of fiscal 2010 in connection with our initial public offering ("IPO") and the related repurchase of $316 million of our senior subordinated notes ("debt repurchase"), net income would have been $76.0 million, an increase of 79.7% from the quarter ended December 31, 2008, or $0.53 per diluted share.
>
> Financial Highlights
>
> Net revenues for the three months ended December 31, 2009 increased 25.5% to $655.5 million, compared to $522.2 million for the same period a year ago. This increase was primarily driven by a 22.7% increase in October student enrollment.

Net income for the second quarter of fiscal 2010, which included the expenses related to our IPO and debt repurchase, was $20.3 million, or $0.14 per diluted share, compared to net income of $42.3 million, or $0.35 per diluted share, for the same period a year ago. Earnings before interest, taxes, depreciation and amortization (EBITDA) increased 3.2% to $139.1 million in the second quarter of fiscal 2010.

48. The February 10, 2010 release again quoted defendant Nelson, in part, as follows:

"We are pleased with our strong financial performance. This performance was the direct result of meeting the educational needs of our students and helping them succeed both academically and professionally. Further, through the efforts of our faculty and career services staff, our graduates are continuing to find employment opportunities in this challenging job market."

49. Regarding the Company's student enrollment, the February 10, 2010 release also

stated, in part, the following:

Student Enrollment

At the start of the current January quarter, total enrollment at our schools was over 139,400 students, a 22.4% increase from the same time last year. Same-school enrollment (schools with enrollment for one year or more) increased 21.4% to over 138,300 students. The number of students enrolled in fully online programs increased 54.9% to approximately 34,800 students.

|  | 2010 January | 2009 January | Percentage Change |
|---|---|---|---|
| Total enrollment | 139,400 | 114,000 | 22.4% |
| Same-school enrollment(1) | 138,300 | 114,000 | 21.4% |
| Students enrolled in fully online programs | 34,800 | 22,400 | 54.9% |

(1) Schools with enrollment for one year or more

Our quarterly revenues and income fluctuate primarily as a result of the pattern of student enrollments. The seasonality of our business has decreased over the last several years due primarily to an increased percentage of students enrolling in online programs, which generally experience less seasonal fluctuation than campus-based programs. The first quarter is typically the lowest revenue recognition quarter due to student vacations.

50.     The February 10, 2010 release also provided purported guidance, in part, as

follows:

Fiscal 2010 Guidance - 3rd Quarter

For the third quarter of fiscal 2010, net income, EBITDA and diluted earnings per
share are expected to be between $52 million and $55 million, $147 million and
$154 million, and $0.36 and $0.39, respectively.

Fiscal 2010 Guidance - Annual

Average student enrollment for fiscal 2010 is expected to grow approximately
21% over fiscal 2009. For fiscal 2010, net income, EBITDA and diluted earnings
per share are expected to be between $120 million and $125 million, $450 million
and $460 million, and $0.87 and $0.91, respectively. Excluding the expenses
related to the IPO and debt repurchase, net income, EBITDA and earnings per
diluted share are anticipated to be between $176 million and $181 million, $540
million and $550 million and $1.28 and $1.32, respectively. Capital expenditures
are projected to be approximately 7.0% of net revenues, compared to 7.5% of net
revenues in fiscal 2009.

The presentation of EBITDA does not comply with U.S. generally accepted
accounting principles (GAAP). For an explanation of EBITDA and EBITDA
excluding expenses related to the initial public offering and debt repurchase, and a
reconciliation to net income, the most directly comparable GAAP financial
measure, see the Non-GAAP Financial Measures disclosure in the financial tables
section below.

**51.     2Q:10 Form 10-Q.**   In an effort to continue to inflate and sustain the artificial

inflation in the price of Education Management shares, on or about February 12, 2010,

defendants also filed with the SEC the Company's 2Q:10 Form 10-Q for the quarter ended

December 31, 2009, signed by defendant West and certified by defendants West and Nelson. To

further condition investors to believe that the Company maintained adequate systems of internal

control so as to assure that its disclosures were true, accurate and complete, the 2Q:10 Form 10-

Q also contained statements concerning Education Management's controls and procedures, in

part, as follows:

**ITEM 4. CONTROLS AND PROCEDURES**

The Company, under the supervision and participation of its management, which include the Company's chief executive officer and chief financial officer, evaluated the effectiveness of its "disclosure controls and procedures," as defined in Rule 13a-15(e) under the Securities Act of 1934, as amended (the "Exchange Act"). This evaluation was conducted as of the end of the period covered by this Form 10-Q. Based on that evaluation, our chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures are effective. Effective controls ensure that information required to be disclosed by the Company in reports that it files under the Exchange Act is recorded, processed and summarized within the time periods specified in Securities and Exchange Commission's rules and forms. These controls and procedures are designed to ensure that information required to be disclosed by the Company in such reports are accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting

52.     Certifications.  The Company's 2Q:10 Form 10-Q also contained Certifications by defendants West and Nelson that continued to attest to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

## CERTIFICATIONS BY THE CHIEF EXECUTIVE OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of Education Management Corporation (the "Company") for the fiscal quarter ended December 31, 2009 on the date hereof (the "Report"), I, Todd S. Nelson, President and Chief Executive Officer of the Company, hereby certify in such capacity, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods reflected therein.

Date: February 12, 2010

By /s/ Todd S. Nelson
Todd S. Nelson

Chief Executive Officer

## CERTIFICATIONS BY THE CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of Education Management Corporation (the "Company") for the fiscal quarter ended December 31, 2009 on the date hereof (the "Report"), I, Edward H. West., Executive Vice President and Chief Financial Officer of the Company, hereby certify in such capacity, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.              The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.              The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods reflected therein.

Date: February 12, 2010

By /s/ Edward H. West
Edward H. West
President and Chief Financial Officer

53.     The statements made by defendants and contained in Education Management's

February 10, 2010 release, and those statements contained in Education Management's 2Q:10

Form 10-Q, were each materially false and misleading and were known by defendants to be

materially false and misleading at that time, or were recklessly disregarded as such, for the

reasons stated herein in ¶46, *supra*.

54.     **3Q:10 Results Announced.** On May 5, 2010, Education Management published

a release announcing results for the third fiscal quarter of 2010, the period ended March 31,

2010. This release stated, in part, the following:

Education Management Corporation Reports Fiscal 2010 Third Quarter Results

PITTSBURGH, May 5, 2010 /PRNewswire via COMTEX/ --Education Management Corporation (Nasdaq: EDMC), one of the largest providers of post-secondary education in North America, today reported its financial results for the three months ended March 31, 2010. Net revenues were $667.9 million, an increase of 24.7% as compared to the third quarter of the prior fiscal year. Net

income was $84.6 million, or $0.59 per diluted share. Excluding expenses incurred in connection with (i) our repurchase of $21.4 million of our senior subordinated notes ("debt repurchase"); (ii) a recently completed corporate restructuring; and (iii) the reversal of a material uncertain tax position liability, net income would have been $71.7 million, an increase of 62.4% from the quarter ended March 31, 2009, or $0.50 per diluted share.

*   *   *

Financial Highlights

Net revenues for the three months ended March 31, 2010 increased 24.7% to $667.9 million, compared to $535.4 million for the same period a year ago. This increase was primarily driven by a 22.4% increase in January student enrollment.

Reported net income for the third quarter of fiscal 2010 was $84.6 million, or $0.59 per diluted share, compared to net income of $44.1 million, or $0.37 per diluted share, for the same period a year ago. Earnings before interest, taxes, depreciation and amortization (EBITDA) increased 24.8% to $170.3 million in the third quarter of fiscal 2010.

55.    The May 5, 2010 release again quoted defendant Nelson, in part, as follows: "We are pleased with this quarter's reported results. We continue to see strong demand for our academic programs across each of our education systems. Our success is driven by a strong commitment to academic excellence and student and graduate success. We strive to ensure our students learn and develop the necessary competencies to be successful in their field of choice."

56.    Regarding the Company's student enrollment, the May 5, 2010 release also stated,

in part, the following:

Student Enrollment

At the start of the current April quarter, total enrollment at our schools was approximately 139,600 students, a 22.1% increase from the same time last year. Same-school enrollment (schools with enrollment for one year or more) increased 20.6% to approximately 137,900 students. The number of students enrolled in fully online programs increased 49.8% to over 36,900 students.

|  | 2010 April | 2009 April | Percentage Change |
|---|---|---|---|
| Total enrollment | 139,600 | 114,300 | 22.1% |
| Same-school enrollment(1) | 137,900 | 114,300 | 20.6% |
| Students enrolled in fully online programs | 36,900 | 24,600 | 49.8% |

(1) Schools with enrollment for one year or more

Our quarterly revenues and income fluctuate primarily as a result of the pattern of student enrollments. The seasonality of our business has decreased over the last several years due primarily to an increased percentage of students enrolling in online programs, which generally experience less seasonal fluctuation than campus-based programs. The first quarter is typically the lowest revenue recognition quarter due to student vacations.

57.     The May 5, 2010 release also provided purported guidance, in part, as follows:

Fiscal 2010 Guidance - 4th Quarter

For the fourth quarter of fiscal 2010, net income, EBITDA and diluted earnings per share are expected to be between $41 million and $44 million, $127 million and $132 million, and $0.29 and $0.31, respectively.

Fiscal 2010 Guidance - Annual

Capital expenditures are projected to be approximately 7.0% of net revenues, compared to 7.5% of net revenues in fiscal 2009.

The presentation of EBITDA, as well as the presentations excluding certain expenses, do not comply with U.S. generally accepted accounting principles (GAAP). For an explanation of EBITDA and EBITDA excluding expenses related to our initial public offering ("IPO"), debt repurchase, restructuring and tax reversal, and a reconciliation to net income, the most directly comparable GAAP financial measure, see the Non-GAAP Financial Measures disclosure in the financial tables section below.

58.     **3Q:10 Form 10-Q.** In an effort to continue to inflate and sustain the artificial inflation in the price of Education Management shares, on or about May 12, 2010, defendants also filed with the SEC the Company's 3Q:10 Form 10-Q for the quarter ended March 31, 2009, signed by defendant West and certified by defendants West and Nelson. To further condition investors to believe that the Company maintained adequate systems of internal control so as to assure that its disclosures were true, accurate and complete, the 3Q:10 Form 10-Q also contained statements concerning Education Management's controls and procedures, in part, as follows:

ITEM 4. CONTROLS AND PROCEDURES

The Company, under the supervision and participation of its management, which include the Company's chief executive officer and chief financial officer, evaluated the effectiveness of its "disclosure controls and procedures," as defined in Rule 13a-15(e) under the Securities Act of 1934, as amended (the "Exchange Act"). This evaluation was conducted as of the end of the period covered by this Form 10-Q. Based on that evaluation, our chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures are effective. Effective controls ensure that information required to be disclosed by the Company in reports that it files under the Exchange Act is recorded, processed and summarized within the time periods specified in Securities and Exchange Commission's rules and forms. These controls and procedures are designed to ensure that information required to be disclosed by the Company in such reports are accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

59. **Certifications.** The Company's 3Q:10 Form 10-Q also contained Certifications by defendants West and Nelson that continued to attest to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

### CERTIFICATIONS BY THE CHIEF EXECUTIVE OFFICER PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of Education Management Corporation (the "Company") for the fiscal quarter ended March 31, 2010 on the date hereof (the "Report"), I, Todd S. Nelson, Chief Executive Officer of the Company, hereby certify in such capacity, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods reflected therein.

Date: May 11, 2010

By:/s/ Todd S. Nelson

Todd S. Nelson
Chief Executive Officer

## CERTIFICATIONS BY THE CHIEF FINANCIAL
## OFFICER PURSUANT TO 18 U.S.C. SECTION 1350

In connection with the Quarterly Report of Education Management Corporation (the "Company") for the fiscal quarter ended March 31, 2010 on the date hereof (the "Report"), I, Edward H. West, President and Chief Financial Officer of the Company, hereby certify in such capacity, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods reflected therein.

Date: May 11,2010

By: /s/ Edward H. West
Edward H. West

President and Chief Financial Officer

60.     The statements made by defendants and contained in Education Management's May 5, 2010 release and those statements contained in Education Management's 3Q:10 Form 10-Q, were each materially false and misleading and were known by defendants to be materially false and misleading at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶46, *supra.*

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF EDUCATION MANAGEMENT IS BELATED DISCLOSED

61.     Beginning in August 2010, reports began to circulate that questioned the legitimacy of the means by which for-profit education providers, such as the Company, recruited students. While no names were initially provided, that day, the GAO published a report finding that: (a) certain for-profit schools used deceptive recruiting practices; (b) certain for-profit

schools substantially inflated their tuition costs; and (c) certain for-profit schools engaged in

other "troubling" practices. Accordingly, that day, Reuters reported, in part, the following:

> WASHINGTON, Aug 3 (Reuters) - U.S. government investigators found that for-profit colleges encouraged fraudulent practices and made deceptive statements to prospective students, according to a study released on Tuesday.
>
> Investigators from the Government Accountability Office posed as students and applied for admission at 15 for-profit colleges across the United States. School personnel encouraged GAO staff to falsify financial aid forms, misled them about costs and gave false information about accreditation.
>
> * * *
>
> GAO's investigators also found that tuition at the for-profit colleges was "substantially more" than for comparable programs at nearby public colleges, but often misled prospective students about total costs.
>
> The study found that a massage therapy program certificate cost $14,000 at a for-profit college but was just $520 at a local community college.
>
> The Career College Association, an organization of mostly for-profit occupational colleges, said in a statement that the GAO report "is deeply troubling" and vowed to strengthen its members' compliance with regulations.
>
> * * *
>
> Investigators found that on average, tuition for an associate's degree was between 6 and 13 times as much at a for-profit school than at a nearby public college. The average of the for-profit schools investigated was $33,467, compared to just over $4,000 for public schools.
>
> A bachelor's degree at a for-profit college averaged $55,000, almost twice as expensive as local public institutions.
>
> The GAO findings add to pressure the industry, which has already faced a crackdown by the Obama administration.
>
> The U.S. Department of Education proposed rules on July 22 that would force for-profit schools to show their former students are either paying off their loans or are capable of doing so.

62.     Similarly, on August 4, 2010, cable news network, CNBC, also published a report

on its website that stated, in part, the following:

GAO Finds For-Profit Schools Encouraged Fraud

An investigation by the Government Accountability Office (GAO) contends that for-profit colleges encouraged fraud and engaged in deceptive and questionable marketing practices.

The investigation is part of a detailed report released this morning in conjunction with testimony before the Senate Committee on Health, Education, Labor and Pensions by Gregory Kutz, the GAO's managing director of forensic audits and special investigations.

Kutz made it clear he believed the company's findings suggested the practices were widespread throughout the industry, suggesting to some industry observers that legislators are likely to more tightly regulate the industry.

Meanwhile Harris Miller, president of the Career College Association, told me the findings are "disturbing." And while the report was expected, "It's hard to put lipstick on a pig. To have four schools have financial aid officers that are advising students to misrepresent their financial situation is totally unacceptable. The necessity to focus on compliance has to be elevated."

63. Also on August 4, 2010, Senator Durbin, Assistant Majority Leader, posted in part the following on his official website, at http://durbin.senate.gov/showRelease.cfm?releaseId=326961:

DURBIN, WEBB TAKE CONCERNS ABOUT FOR-PROFIT COLLEGES TO V.A. AND D.O.D.

Wednesday, August 4, 2010

[WASHINGTON, D.C.] - Concerned about reports of some for-profit colleges aggressively targeting military personnel and veterans, U.S. Senators Dick Durbin (D-IL) and Jim Webb (D-VA) today asked the Secretaries of the Department of Veterans Affairs, Eric Shinseki, and the Department of Defense, Robert Gates, for detailed information on how veteran and military tuition assistance program funding is being spent.

Specifically, Durbin and Webb asked for data on the tuition assistance used for education at for-profit colleges and the standards in place to ensure that veterans,

service members and their families are given the best possible options for higher education and that taxpayer funding is being well-spent.

"Some for-profit colleges serve VA beneficiaries [and active duty students and their families] well by offering flexible course schedules, distance learning, and course credit for military training," the Senators wrote. "But we have heard reports that some for-profit institutions may be aggressively targeting service members and veterans, signing them up for educational programs that may bring little benefit to future employment opportunities, low graduation rates and high default rates. Finally, with the recent passage of the Post 9/11 GI Bill, which provides for tuition reimbursement, we have heard concerns about excessive tuition being charged at some of these institutions."

In 2008, Congress passed the Post-9/11 GI Bill, hallmark legislation introduced by Senator Webb on his first day in office, to provide veterans with comprehensive educational benefits on par with the World War II-era GI Bill. More than 34,000 beneficiaries took advantage of the program in fall 2009 - the first year funding was available. Seven of the top ten recipients of Post-9/11 GI Bill funding were for-profit schools.

The United States began providing education benefits to veterans and members of the military in 1944, as part of the Servicemen's Readjustment Act, which was the origin of the GI Bill. Many of these educational opportunities are free or at reduced cost, and offer the flexibility necessary for service members subject to short-notice, worldwide deployments. In 2009, the Department of Defense spent $424 million on tuition assistance and the Department of Veterans Affairs spent $3.58 billion.

On June 21, Durbin joined with other lawmakers in asking the GAO to assess the quality of for-profit institutions, as well as how much of their revenue is comprised of Federal student aid and other Federal funding sources. Other Senators signing on to today's letter include: Senators Tom Carper (D-DE), Kay Hagan (D-NC), Claire McCaskill (D-MO), Russ Feingold (D-WI) and Tom Harkin (D-IA).

64. While the GAO report did not specifically name the companies engaged in such fraudulent and deceptive registration practices, investors quickly deduced that this report was aimed at Education Management and several of its competitors. Accordingly, shares of the Company fell almost 18% in the three trading days between August 3 and August 5, 2010. The chart below evidences the decline in the price of Company shares during that time:



## CAUSATION AND ECONOMIC LOSS

65.     Defendants' publication of materially false and misleading statements at the beginning of the Class Period allowed the Company to sell at least $414 million of common stock to the public in the October 2009 IPO and, thereafter, during the remainder of the Class Period it also had the intended effect of causing Education Management's shares to trade at artificially inflated levels. As a result of defendants' publication of these false statements, during the Class Period shares of the Company traded to a high of almost $17.00 per share soon after the IPO, in late October 2009.

66.     Contrary to the positive statements made by defendants during the Class Period, however, between August 3 and August 5, 2010, investors came to conclude that the Company would come nowhere near achieving guidance previously sponsored and/or endorsed by defendants, after the federal government announced an investigation into the fraudulent and manipulative recruiting practices utilized by for-profit schools, such as Education Management.

These belated disclosures had an immediate, adverse impact on the price of Education Management shares.

67.     The decline in Education Management's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud and illegal course of conduct being revealed to investors and to the market.    The timing and magnitude of Education Management's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to defendants' fraudulent conduct.

68.     The chart below evidences the artificial inflation in the price of Education Management shares at the time of the October 2009 IPO and thereafter throughout the Class Period, and the dramatic decline in the price of those shares once the true financial and operational condition of the Company became known to shareholders:



69. Moreover, during the same period in which Education Management's share price fell almost 20% as a result of defendants' illegal and improper course of conduct and their fraud being revealed, in early August 2010, the Standard & Poor's 500 securities index was relatively unchanged. The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Education Management's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

70.    As alleged herein, defendants acted with scienter in that each defendant knew that

the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Education Management, their control over, and/or receipt and/or modification of Education Management's  allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Education Management, participated in the fraudulent scheme alleged herein.

71.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because the scheme: (a) deceived the investing public regarding Education Management's business, operations, management and the intrinsic value of Education Management common stock; (b) enabled defendants to register for sale with the SEC, over $414 million of Company stock in connection with the October 2009 IPO; (c) enabled defendants to inflate and maintain the artificial inflation in the price of Company stock throughout the remainder of the Class Period; and (d) caused plaintiff and other members of the Class to purchase Education Management common stock at artificially inflated prices.

### Applicability Of Presumption Of Reliance: <u>Fraud-On-The-Market Doctrine</u>

72.     At all relevant times, the market for Education Management's common stock was an efficient market for the following reasons, among others:

(a)     Education Management's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and

automated market;

(b)     As a regulated issuer, Education Management filed periodic public reports with the SEC and the Nasdaq;

(c)     Education Management regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Education Management was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for Education Management securities promptly digested current information regarding Education Management from all publicly available sources and reflected such information in Education Management stock price. Under these circumstances, all purchasers of Education Management common stock during the Class Period suffered similar injury through their purchase of Education Management common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

74.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Education Management who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

75.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Education Management, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I
### (Against All Defendants)
### For Violation of Section 11 of the Securities Act

76.     Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do ***not*** allege fraud, scienter, or the intent of the defendants to defraud plaintiff or members of the Class.   This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement and Proxy-Prospectus.  This Count is asserted by plaintiff against all defendants by and on behalf of persons who acquired shares of the Company pursuant to the

false Registration Statement and Proxy Statement issued in connection with the October 2009 Initial Public Offering.

77.     Education Management is the issuer of the stock issued via the false Registration Statement and Proxy-Prospectus.   As such, Education Management is strictly liable for each false and misleading statement contained therein.

78.     The Individual Defendants are each signatories of the Registration Statement or Underwriters of the October 2009 Initial Public Offering.   Therefore, each of these defendants had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Proxy-Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, defendants should have known of the material misstatements and omissions contained in the Registration Statement and Proxy-Prospectus and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.   As such, each of these defendants is liable to plaintiff and the Class.

79.     Each of the defendants identified in Count I issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Proxy Statement with misrepresented or failed to disclose, *inter alia,* the facts set forth above.   By reasons of the conduct alleged herein, each defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.   As a direct and proximate result of defendants' wrongful conduct, the price for the Education Management common stock sold in the October 2009 Initial Public Offering was artificially inflated and plaintiff and the Class suffered substantial damages in connection with their purchase of

Education Management common stock.

80.    Plaintiff and other members of the Class acquired their Education Management stock without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by defendants' misconduct and by the material misstatements  and omissions  of the aforementioned Registration  Statement and Proxy-Prospectus.

81.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years after the October 2009 Initial Public Offering of Education Management common stock.

**COUNT II**
**(Against The Individual Defendants)**
**For Violation of Section 15 of the Securities Act**

82.    Plaintiff incorporates by reference each and every allegation contained above as if set forth herein. This Count is asserted against the Individual Defendants.

83.    Throughout the Class Period, the Individual Defendants acted as controlling persons of Education Management within the meaning of Section 15 of the Securities Act.  By reason  of their  stock  ownership,  senior  management  positions  and/or directorships  at the Company, as alleged above, these defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Education Management to engage in the unlawful acts and conduct complained of herein.

84.    By reason of such conduct, the defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, plaintiffs and the Class suffered damages in connection with their acquisition of Education Management common stock.

## COUNT III
### (Against All Defendants)
### Violation of Section 12(a)(2) of the Securities Act

85.     Plaintiff repeats and realleges each and every allegation contained above.

86.     This Count is brought by plaintiff pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of Education Management shares in connection with and traceable to the October 2009 Initial Public Offering. This cause of action is brought against all defendants.

87.     Defendants were sellers, offerors, underwriters and/or solicitors of sales of the Education Management shares offered pursuant to the October 2009 IPO Registration Statement and Proxy-Prospectus.

88.     The Education Management Initial Public Offering Registration Statement and Proxy-Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Proxy-Prospectus and Registration Statement.

89.     The defendants owed to the purchasers of Education Management  shares which were sold in the October 2009 Initial Public Offering the duty to make a reasonable and diligent investigation of the statements contained in the Proxy-Prospectus and Registration Statement, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   These defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering materials as set forth above.

90.     Plaintiff and other members of the Class purchased or otherwise acquired Education Management shares pursuant to and traceable to the defective Proxy-Prospectus. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Proxy-Prospectus and Registration Statement.

91.     Plaintiff, individually and representatively, hereby offer to tender to defendants those securities which plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

92.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, plaintiff and members of the Class who hold Education Management  shares purchased in the October 2009 Offering have the right to rescind and recover the consideration paid for their Education Management shares and, hereby elect to rescind and tender their Education Management shares to the defendants sued herein.   Plaintiff and Class members who have sold their Education Management shares are entitled to rescissory damages.

93.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action.  Less than one year elapsed from the time when plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## COUNT IV
### (Against the Individual Defendants)
### Violation Of Section 10(b) Of The Exchange Act

### And Rule 10b-5 Promulgated Thereunder

94.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

95.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding Education Management's business, operations, management and the intrinsic value of Education Management common stock; (b) enable defendants to register for sale with the SEC, over $414 million of Company stock in connection with the October 2009 IPO; (c) enable defendants to inflate and maintain the artificial inflation in the price of Company stock throughout the remainder of the Class Period; and (d) cause plaintiff and other members of the Class to purchase Education Management   common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

96.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Education Management's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

97.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Education Management as specified herein.

98.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Education Management's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Education Management and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Education Management common stock during the Class Period.

99.     Each of the Individual Defendants' primary liability, and controlling person liability,  arises from the following facts:  (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

100.     The defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.   Such defendants' material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing Education Management's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

101.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Education Management  common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Education Management's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Education Management common stock during the Class Period at artificially high prices and were damaged thereby.

102.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

Education Management was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Education Management  common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

103.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

104.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT V**
**(Against the Individual Defendants)**
**Violation Of Section 20(a) Of The Exchange Act**

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    The Individual Defendants acted as controlling persons of Education Management within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in  and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

108.    As set forth above, Education Management and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and

any appropriate state law remedies to assure that the Class has an effective remedy; and

      E.     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 8, 2010         GILMAN AND PASTOR, LLP

         By:    s/ Kenneth G. Gilman
               Kenneth G. Gilman
               Gilman and Pastor LLP
               16 Fourteenth Avenue
               Wareham, MA 02571
               Telephone: (508) 291-8400
               Facsimile: (508) 291-3258
               Email: kgilman@gilmanpastor.com